# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 06-03009-01-CR-S-RED |
| MICHAEL E. CONNER, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. A hearing was held before the undersigned on May 3, 2006. Defendant was represented by Jason Coatney, and the government was represented by Rose Barber, Assistant United States Attorney.

Defendant moves the Court to suppress all evidence of alleged pornography taken from the search and seizure of his computers. Defendant asserts that the government has failed to carry its burden of proving that his wife's consent to search was voluntary.

It is the government's position that Ms. Conner's consent was voluntary under the totality of the circumstances.

This case evolved from a federal investigation in Kansas City involving child pornography, which led the FBI to defendant in Nixa, Missouri. The investigation resulted in a visit to defendant's residence by an agent for the Department of Family Services ["DFS"], accompanied by

1

a Nixa Police Officer. After that visit, a state search warrant was obtained. Subsequently, two federal search warrants were issued.

The first witness for the government, James Morton, Special Agent for the FBI, became involved in an investigation involving child pornography in October of 2005. Agent Morton set up a meeting with the Nixa Police Department regarding the allegations of child pornography There was a discussion regarding a child abuse hotline call, between the Chief of Police and himself, because there was a young child in the suspect's home. The Chief called in a hotline report, which went to a DFS investigator. On October 19, 2005, the investigator went to defendant's home with a Nixa Police Officer, Corporal Applegate. As a result of this visit, two computers were seized, with the consent of defendant's wife.

On October 20, a state search warrant was obtained to search the computers that had been seized on the 19th. The fact of Ms. Conner's consent was included in the affidavit in support of the search warrant. Later, Agent Morton received items, including computer images, from the Nixa Police Department, which had been obtained as a result of the state search warrant.

He then obtained a federal search warrant, for which he was the affiant, in which a laptop computer and compact discs were sought. He indicated, in his affidavit, that Ms. Conner had given consent for computer items to be taken from the residence at the time of the DFS visit. He had no information that suggested that she had not given her consent or that she had revoked it.

After he obtained the first federal search warrant, he went to defendant's residence to search for additional computer equipment. Once there, he saw items that were described in the search warrant, and he saw additional computer-related items that were not specifically listed on the search warrant. Another agent asked Ms. Conner for consent to seize these additional items from the

2

residence, and he was present when she gave permission. Agent Morton testified that he did not coerce or threaten Ms. Conner with taking away her child if she did not give consent. This is also true of the agent who actually asked her about seizing the items. Ms. Conner was upset, because of the search warrant and the fact the officers also had an arrest warrant for her husband. He had been arrested and was outside the house. She had just gotten home from work, so was appropriately dressed. Ms. Conner was lucid and responded appropriately to the questions asked of her. She was generally cooperative and did provide consent to seize the additional computer-related items. After he obtained consent from defendant's wife, he seized the additional items. Subsequently, he then secured a second federal search warrant to search all the items that had been seized.

In November of 2005, Agent Morton stated that he had talked to Ms. Bishop, who was a defendant in a federal case in Kansas City. She provided information indicating that there had been an exchange of child pornography between her and defendant. She said they watched child pornography together on his laptop computer, and that he had compact discs with child pornography on them.

Agent Morton interviewed defendant in November, at the FBI office. He admitted knowing Ms. Bishop, and having a sexual relationship with her, but denied that he had child pornography on his computer. Defendant also admitted that he had discussed child pornography with Ms. Bishop, but indicated that this was merely to keep her interested in a sexual relationship with him. During this telephone conversation, defendant knew that his computers had been seized. He wanted to know when he would get them back because the Nixa Police Department had told him that he would get them back as soon as possible because they were his work computers from home. According to Agent Morton, defendant did not otherwise comment on the taking of his computers. He never

3

Case 6:06-cr-03009-MDH   Document 30   Filed 05/22/06   Page 3 of 16

said that he had not given permission for anyone to take his computers, nor did he express anger about them having been taken. Defendant was frustrated because he does freelance work from home, needed the computers back for billing purposes, and he stated that he was losing money by not having them.

On cross examination, Agent Morton testified that he first learned of defendant in October of 2005, and the case was assigned to him on October 19th. Ms. Bishop had been arrested in September of 2005. Regarding the meeting with DFS, the concern about the child was that there was an alleged child pornographer in the home. Also, in the pictures they received from the other federal case in Kansas City, there were pictures of defendant and another woman, appearing to be having sex. They were afraid there might be pictures of the two-year old also. He believed that the child might be exposed to harm because the woman in the photograph was under indictment for possession of child pornography. Ms. Bishop had also alleged that defendant was involved in owning, producing, and possessing child pornography. Agent Morton knew that defendant was employed outside his home, and also had a business involving computers that he conducted from his home. The officer acknowledged that defendant used an upstairs loft as his home office.

Regarding the conduct of defendant's wife, she was upset about the arrest. They entered the home with the arrest warrant and the federal search warrant, and she was asked for consent to seize other items that were not listed in the search warrant. He acknowledged that there were a number of officers from various agencies inside and outside the residence at this time. He was not in uniform, however, and stated that the uniformed officers all stayed outside.

The second witness for the government was Bruce Belin, Chief of Police for Nixa. He testified that he learned about the investigation of defendant involving child pornography in October

of 2005. He had some contact with the Willard Police Department regarding whether a person by defendant's name lived in Willard. He also spoke to the Grandview Police Department about the federal investigation involving Ms. Bishop. He eventually had conversations with the FBI regarding this investigation. He assigned the case to Corporal Graham Applegate. He participated in the meeting with Agent Morton regarding whether the investigation should be reported to DFS. He felt the case should be hotlined, which they would do in any situation like this, because there were allegations of child pornography in the home and a child was also in the home. DFS Case Worker Angie Atwell became involved in the case. Chief Belin denied that the hotline call was any kind of ruse or pretense to get into the home.

On cross examination, Chief Belin testified that he received a telephone call from the Willard Police Department, and eventually learned about the investigation in Grandview involving Ms. Bishop. He testified that any delay that occurred before the hotline call was made was because of the investigation being conducted to ascertain who the correct person was who was suspected of being involved with child pornography.

Corporal Graham Applegate of the Nixa Police Department was next called to testify. Regarding the meeting that occurred with the Nixa Police Department, Corporal Applegate believed he first received a call from Agent Morton, although it could have been that his office called the FBI. The application in support of the state search warrant indicated that his office was contacted by Agent Morton. In any event, he received information from the FBI about this case, which included information about the Kansas City case. It indicated that Detective Gilbert of the Grandview Police Department was assisting in an investigation of June Bishop. At the time of the meeting with Agent Morton and Chief Belin, he knew that defendant had been accused of being involved in child

5

pornography, and that there was a small child in the home. As a patrolman and a detective, he has worked with DFS. It was his opinion that the case needed to be hotlined. It would be the usual course of events to call in DFS. He arranged to go to defendant's home with a DFS investigator, Angie Atwell. It is his practice to identify himself, identify the DFS worker, and inform the person of why they are there. In this case, this is what occurred.

When Corporal Applegate went to defendant's residence on the hotline call with DFS worker Atwell, he believes he was in street clothes, with his badge on his belt. He made it clear to Ms. Conner that he was a police officer, and she admitted them into the home. She was told that they were investigating inappropriate images of children or child pornography, and that her husband had been identified as possibly being involved. He did not tell her about the possibility that her husband might be involved in an extramarital affair. He also told her they were concerned about the child. The main concern was with the child's safety and the child's well-being in the home. Everything checked out in the home and with the child. There was nothing that pointed to immediate danger. They continued to advise Ms. Conner about the investigation and that computers were possibly involved. She was very cooperative, telling him where the computers were. He asked if he could take them. He made it clear they would not examine the computers at the scene, and that someone else would do that. She gave consent to take the computers from the home. One computer was downstairs in plain view, and another was upstairs in an office-like loft area. She showed them both to him. She had free access to both areas of the home. He didn't think there was a door into the loft area, which was open. Ms. Conner never indicated that she wasn't suppose to be in that area, although she did say her husband used the loft primarily for his business. She appeared lucid and in control, and was not in distress, nor intoxicated. She was not told that if she didn't give consent,

6

they would take her child. They never linked the two, and she appeared to understand and was cooperative. Ms. Conner never indicated that she changed her mind, and he left his business card so she could contact him.

After the computer equipment was seized during the hotline visit, they sought a state search warrant to search that equipment. He was the affiant. While typing the application, he received a telephone call from defendant, who wanted to know what was going on. The officer told defendant the same explanation that he'd given to his wife. Defendant wanted to cooperate, and he gave him permission to search that computer equipment. He denied any knowledge of child pornography activity. Even though Corporal Applegate believed that defendant had consented to the further search, he finished the application process and obtained the state search warrant. On the affidavit in support of that warrant, Corporal Applegate provided information regarding Detective Gilbert in Kansas City. He indicated that Ms. Bishop's computer contained child pornography images, which had been sent to defendant's computer. Two photographs had been sent from defendant to Ms. Bishop, and although these were not child pornography, they did depict defendant. He was therefore interested in searching defendant's computer for the child pornography from Ms. Bishop. He believed the information from Detective Gilbert was accurate. He was able to corroborate that defendant lived at this residence, and that he had expensive computer equipment.

On cross examination, Corporal Applegate testified that he informed Ms. Conner that they were there to check on the well-being of the child and that they were investigating allegations of child pornography. He explained to her that they had to see the child and observe the condition of the house. He could not say how long it took to determine that the child was okay. Regarding defendant's telephone call, the officer admitted that the affidavit does not mention that he called and

7

gave consent. In his affidavit, he mentioned that Ms. Conner gave consent, but did not include defendant's consent, perhaps because he had already finished that portion of the affidavit. The officer admitted that defendant said he needed his computer for work and wanted it back, but he could not remember the exact words that he used to give consent. The computers were in plain view if a person were standing in the rooms where they were located. He admitted that the only thing in the upstairs of the home was the office area, with a number of computers on the floor. By all indications, it was a home office. He admitted that the child was not removed from the home. The officer acknowledged that the family photograph that was alluded to in the affidavit did not contain child pornography, although there might have been that implication.

On redirect examination, the witness testified that he did not include information about defendant's consent in the affidavit, but he did include that information in his report of the event. His report reflected that Ms. Conner gave consent and then later, when defendant contacted him by phone, he gave consent to search the computers. Regarding information about what the photographs were, he did state in his affidavit that the photograph of the man, woman, and child came from defendant to Ms. Bishop.

Defendant's wife, Melissa Conner, testified. She has a high school diploma. She stated that Corporal Applegate came to her house with Case Agent Angie Atwell on the 19th of October. It was her testimony that she had never had any encounter with police officers before. She had had an encounter with DFS, but it did not involve any allegation of child abuse or neglect involving her or her husband. When she was approached on the day in question, she had just gotten home from work at about 4:30. Her daughter was not there because she was still at daycare. Officer Applegate told her about the allegations against her husband and said they needed to see her daughter. She

8

showed them through the downstairs and said upstairs was her husband's office, where she said they were welcome to look. He told her the quickest way to get it over with was to let them take the computers for a couple of days. She said she needed to ask her husband, because she didn't know if he had work to do. She then picked up her daughter, and the officers returned. She allowed them to come in, and Ms. Atwell talked to her daughter. Ms. Conner was trying to listen to the conversation while she advised Officer Applegate that she had not been able to reach her husband. The officer kept asking if he could take them, and kept telling her the easiest way to get things taken care of was to just let them take the computers. She described the office in the loft as being total office space, with all his property there. The computer that was seized from his office was his business computer, which he leases. She had used it in the past at a previous address, but once her husband decided to open his home business, he bought her another computer, the one that was kept downstairs. She did not believe she had a choice about letting the officers into her home. She did not know it was an option to turn them away.

On cross examination, she testified that her husband worked at Letsch Advertising for eight years. She had done some of her work for Kodak years before on her husband's computer equipment, but once he decided to open his freelance business, she got a different computer to use.

Defendant testified on his own behalf. It was his testimony that he officially opened his freelance business about two years ago. He stated that he called Officer Applegate on the 19th. He wouldn't say he gave him consent, nor did he say he could keep the computers.

On cross examination, he admitted that he called Officer Applegate, using a telephone number provided on a business card the officer had given to his wife. His purpose in calling was to check on everything, and to find out what was going on. He understood that there was an

9

investigation going on involving child pornography, according to his wife. He knew that Ms. Bishop had been arrested because she'd called him months before to tell him. He admitted that he had talked to Agent Morton about having lied to Ms. Bishop about possessing child pornography, but he admitted that he had looked at child pornography with her. When he called Officer Applegate, he knew about Ms. Bishop having been arrested. He testified that when he called Corporal Applegate, he tried to be cooperative with him by listening to him. He admitted that the officer was very polite. His purpose in calling was to find out what was going on and to check on everything. He never told the officer that his wife should not have given consent. He did not believe he ever told Corporal Applegate that he did not have permission to have the computer equipment. He did, however, ask for his computer equipment back that night. Regarding the officer's statement that he gave consent, he did not believe he gave it because he had work to do on that computer and needed it back that night.

Defendant contends that Corporal Applegate and Angie Atwell went to his home under the pretense of a hotline call because they did not otherwise have enough evidence for a search warrant, and that the officers used the threat of removing the child from the home to obtain Ms. Conner's consent, which was therefore not voluntary. It is his position that they convinced Ms. Conner that she was required to allow them to search the home, and that they subsequently illegally seized two computers including his work computer. He asserts that Ms. Conner has never had any interaction with the police, and she was intimidated by the presence of DFS because she knew the power of that agency through prior experience with it. She was also intimidated by the threat of losing her child if she did not cooperate.

Additionally, defendant asserts that Ms. Conner did not have the authority to allow the search

10

of his home office and did not have the authority to allow the seizure of his property. He contends that the home had an office separate and distinct from the home. He believes there is an expectation of privacy in his home office, and that because he's married and she has common access, does not mean she had authority to consent. It is also asserted that Ms. Conner told Corporal Applegate that she did not feel she could agree to the taking of her husband's business computer because it would interfere with his work.

He further alleges that the police officer procured a search warrant with an application and affidavit that contained false and misleading information, which did not contain probable cause. It is asserted that when Corporal Applegate he sought the state search warrant, he indicated that the Nixa Police Department was contacted by the FBI, whereas Agent Morton contended that the information about the child pornography allegations came from the police. Defendant also claims that one of the photographs referred to in the search warrant is a portrait-photo and could not reasonably be evidence of child pornography; and that the other photo does not have a child in it.

Finally, defendant contends that at no time did he consent to the search or seizure of his computer.

The government asserts that Ms. Conner voluntarily consented to the seizure of the computers; that she was not deceived; and that she had common authority over the premises to which she gave consent to search.

Regarding the legality of the October 19th seizure, the government asserts that it did not rest solely on her consent because defendant gave his own verbal consent when he called Corporal Applegate. Further, it is asserted that a state search warrant was obtained and the officers acted in good faith and on a facially-valid warrant in executing the search warrant. Therefore, the

11

government contends that the evidence should be admissible under Leon even if it turns out that there was insufficient probable cause for the warrant.

The Eighth Circuit has relied on a number of factors to determine whether consent to search is voluntary. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Some of the factors relating to the person giving consent include age, general intelligence and education, prior experience with law enforcement, and whether he or she was under the influence of drugs or alcohol. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (internal citations omitted). Conduct of law enforcement to be considered includes the length of the detention, whether there was physical intimidation, if the defendant was in custody or under arrest, if the police made promises or misrepresentations, if the interrogation was in a public place, and whether the accused objected to the search or stood by silently. Id.

Based on the testimony of the witnesses regarding the seizure of the computer equipment at defendant's residence when the DFS hotline call was made, the Court finds that Ms. Conner was not illegally coerced into giving consent. This conclusion is based on a full review of her testimony, together with the testimony of Corporal Applegate, who went to the residence with Angie Atwell. They knocked and were invited into the house. The officers told Ms. Conner that there had been a report about child pornography, and they were concerned about the child's well-being. They told her they needed to see her daughter, who was still at daycare, so she picked up her daughter, and the officers came back. Once again, she let them in. When they asked about computers in the home, the credible evidence establishes that Ms. Conner made an informed decision to give her consent. The law is clear that the proper focus is the totality of the circumstances, including the characteristics of the person consenting and the environment in which consent is sought. Mancias,

12

350 F.3d at 805. In this case, it cannot be said that Ms. Conner, who has a high school education, and was not under the influence of drugs or alcohol, did not voluntarily consent. The fact that she had had a prior experience with DFS in a wholly different context does not establish that she would have been more vulnerable to the agency's presence than the average person. Additionally, while Ms. Conner stated that she did not know she could refuse consent, and testified that she was trying to reach her husband, she did not testify that she was afraid or overwhelmed into giving consent. While defendant argues that she was afraid she might lose her daughter, Ms. Conner's testimony did not indicate that concern about her daughter influenced her decision to let the officers take the computers. She stated that Agent Atwell talked to her daughter, and she tried to listen to that conversation. She testified twice that she was merely told it would be easier if the officers could take them at that time. Her testimony indicated that her main concern was that her husband might need the computers for work reasons. Corporal Applegate's testimony regarding the atmosphere during the home visit, together with the testimony of Ms. Conner herself, supports the conclusion that she voluntarily consented to allowing the computer equipment to be seized. Based on the totality of the circumstances, there is no evidence to suggest that the officers strong armed her and/or employed coercive tactics that would have overborne her ability to make a voluntary decision.

Regarding whether she had the authority to grant consent, in her own testimony Ms. Conner admitted that she told the officer and Agent Atwell that they were welcome to look around. Although she expressed some hesitation regarding her husband's office area in the loft, she did not testify that she told them she did not have access to that area or that she could not allow them to enter it. Additionally, defendant never testified that she did not have access to the area. The way

13

the office was arranged in an open loft area also belies the conclusion that it was in any way restricted. She also acknowledged that she had used the computer for her own business in the past. According to Corporal Applegate's testimony, if a person were standing in the room, the computers were in plain view. Ms. Conner clearly had the authority to decide on her own whether she wanted to give consent for the seizure of the home computer, which she shared with her husband, and with the business computer, which had been made available to her. The evidence adduced at the hearing supports a finding that Ms. Conner had common authority over the entirety of the residence, and therefore, could consent to the search. United States v. Matlock, 415 U.S. 164, 170 (1974).

In terms of the visit to defendant's home where Agent Morton went with a number of other agents, the evidence established that they had a federal search warrant and an arrest warrant for defendant. Once there, he saw items that were described in the search warrant, and he saw additional computer-related items that were not specifically listed on the search warrant. Agent Morton observed another agent ask Ms. Conner for consent to seize these additional items from the residence, and he was present when she gave permission. There is no evidence of threats or coercion involving taking her child. Although Agent Morton acknowledged that Ms. Conner was upset, she was cooperative and did provide consent to seize the additional computer-related items. Despite the fact that her husband had been arrested and there were uniformed officers outside with him, there is nothing to suggest that Ms. Conner was coerced to consent to this seizure or that she did not do so voluntarily.

On the issue of defendant's consent, the Court has fully reviewed the evidence and finds that it is inconclusive regarding whether defendant consented to the search of his computers. Corporal Applegate was unable to testify regarding what defendant said or how he implied that he gave

14

consent. According to defendant's testimony, he wanted his computers back, and he did not feel like he had consented. The credible evidence establishes that Ms. Conner, who had the authority to do so, had voluntarily consented to the seizing of computers and computer-related items. Even assuming that defendant did not consent, he did not indicate that Ms. Conner did not have the right to do so. The Court finds that the items were lawfully seized because Ms. Conner had voluntarily consented to the seizures.

Therefore, under the totality of the circumstances, the Court finds that Ms. Conner voluntarily consented to the seizure of the computers and computer equipment on both occasions when her permission was requested. Accordingly, the Court finds that defendant's motion to suppress the search and seizure of the computers and related items from his residence must be denied on this basis.

Defendant also challenges the validity of the state search warrant. He contends that when Corporal Applegate applied for the search warrant, the affidavit indicated that the Nixa Police were contacted by the FBI. Defendant objects to this because Corporal Applegate's report indicated that his office contacted the FBI. The affidavit also indicated that there was evidence to show that child pornography had been transferred from Bishop's computer to defendant's. It referred to two photographs, one which depicted a black male engaged in sexual relations with a white female. Defendant objects to these statements because one of the photographs was not sexually explicit and the other did not show a child.

Having fully reviewed the evidence adduced at the hearing and the applicable documents, the Court finds that there was probable cause to support the search warrant, and there is no evidence that there were any false or misleading statements deliberately made that would render it invalid.

15

Corporal Applegate testified that believed he first received a call from Agent Morton, although it could have been that his office called the FBI. The application in support of the state search warrant indicated that his office was contacted by Agent Morton. In which ever order the contact occurred, he received information from the FBI about the case involving Ms. Bishop, and implicating defendant. It is patently clear that there was no deliberate misstatement regarding this information that would call into question the validity of the search warrant. Further, the fact that details of the photographs were not delineated does not mean that information was deliberately omitted to mislead the Court. Rather, the photographs corroborated the fact that there was a child in the home, and that there was concern for that child's well-being, and further corroborate the fact that there was a relationship between Ms. Bishop and defendant. Accordingly, the Court finds that defendant's argument that there was not probable cause to support the search warrant and that the officer made false and misleading statements must be rejected. On that basis, additionally, the motion to suppress must be denied.

F or the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's motion to suppress evidence should be denied.

    /s/ James C. England  
JAMES C. ENGLAND, CHIEF  
United States Magistrate

Date: May 22, 2006